IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

JUN 29 2018

Clerk, U.S. Courts
District Of Montana
Missoula Division

| | |
|---|---|
| BITTERROOT RIDGE RUNNERS SNOWMOBILE CLUB; et al., | CV 16–158–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| UNITED STATES FOREST SERVICE; et al.; | |
| Defendants, | |
| and | |
| FRIENDS OF THE BITTERROOT; et al., | |
| Defendant-Intervenors. | |

Plaintiffs move for summary judgment arguing that Federal Defendants

violated the National Forest Management Act, 16 U.S.C. § 1600 et seq.

("NFMA"); the Wilderness Act, 16 U.S.C. § 1131 et seq.; the Montana Wilderness

Study Act of 1977, Pub. L. No. 95-150, 91 Stat. 1243 (1977) ("MWSA"); the

National Environmental Policy Act, 42 U.S.C. § 4331, et seq. ("NEPA"); and the

Administrative Procedure Act, 5 U.S.C. § 551, et seq. ("APA") when they adopted

the U.S. Forest Service Travel Plan for the Bitterroot National Forest ("Travel

Plan"). Federal Defendants, as well as Defendant-Intervenors, oppose Plaintiffs' motion and have filed cross-motions for summary judgment.[1] As discussed below, the Court will grant Plaintiffs' motion in part and deny the motion in part, and grant in part the cross-motions for summary judgment of Federal Defendants and Defendant-Intervenors.

## BACKGROUND[2]

This declaratory judgment action seeks injunctive relief from the Bitterroot Travel Plan. The Bitterroot Forest lies in the Forest Service's Northern Region, or "Region 1," and includes about 1.6 million acres located in west central Montana and a small portion of east central Idaho. Within the forest's boundaries are the Sapphire and Bluejoint Wilderness Study Areas ("Study Areas") and the Selway-Bitterroot and Bluejoint Recommended Wilderness Areas. Popular recreation activities in the Bitterroot include boating, fishing, hunting, gathering forest products, skiing, hiking, mountain biking, riding wheeled off highway vehicles ("OHVs") and snowmobiling.

---

[1] Also pending is Federal Defendant's Motion to Strike Extra-Record Documents appended to Plaintiffs' summary judgment briefs, as well as alleged improper declarations and documents cite in Plaintiffs' Statement of Undisputed Facts. (Doc. 44.) Because the Court's decision in no way relied upon those materials and arguments, the Court will grant Defendant's motion to strike.

[2] This background section is derived from Plaintiffs' Complaint, the parties' Statements of Undisputed Facts, and the briefs in support of their respective motions.

The governing plan for the Bitterroot Forest is the 1987 Forest Plan.

Coordination on the Bitterroot Travel Plan project began in the fall of 2006, after

the implementation of the Travel Management Rule, which was formally adopted

on November 9, 2005. The Bitterroot Travel Management Planning Project Draft

Environmental Impact Statement ("DEIS") was released on August 5, 2009.

Following a public comment period, a Draft Record of Decision ("Draft ROD")

and initial Final Environmental Impact Statement ("Initial FEIS") were issued in

April 2015.

After the required objection response period and review from the Objection

Reviewing Officer, the Forest Service responded to ten different issues related to

the Initial FEIS. The Forest Service issued a revised Final Environmental Impact

Statement in March 2016 ("FEIS"), which was formally adopted on May 11, 2016

in the Final Record of Decision ("Final ROD"). The ROD and resulting Forest

Plan were implemented 30 days after publication of the notice of the ROD in the

Federal Register. The ROD constitutes the governing land use plans for the

Bitterroot Forest.

## I.    Recommended Wilderness Areas

If Congress has not officially designated an area as "wilderness," the Forest

Service may determine that an area does meet wilderness criteria, and designate

and manage it as a "recommended wilderness area" ("RWA"). Here, the Forest Service has designated certain areas in the Bitterroot Forest as RWAs, and the Travel Plan closed all RWAs to motorized and bicycle travel. AR 0210, 0193. None of the DEIS action alternatives allowed for motorized equipment or mechanical transport in RWAs.

During the objection period, multiple objections were made regarding the RWAs. The Objection Response addressed the RWA evaluation/designation objection. The Final ROD adopted Alternative 1, with some modifications, as the final decision of the Bitterroot on the Travel Management project. The Final ROD reduced areas designated open for snowmobile use from 748,981 acres to 543,840 acres, and prohibited all motorized or mechanized transport, including bicycles, for both summer and winter uses, in RWAs.

## II. Wilderness Study Areas

Before the adoption of the Forest Plans, over-snow motorized and mechanized use was permitted in the Sapphire and Blue Joint WSAs in 1977. The Blue Joint WSA contains approximately 65,860 acres, ranging from 4,900 to 8,600 feet in elevation, with roughly half of the area being relatively high mountainous terrain over 7,000 feet. (Doc. 1 at 22.) The Sapphire WSA contains 117,030 acres, with over 72,000 acres being located on the adjacent Beaverhead-

-4-

Deerlodge National Forest. (*Id.* at 23.) The FEIS indicates that the Bitterroot portion of the Sapphire WSA consists of 44,116 "net acres." The Sapphire WSA has elevations ranging from 5,000 to 9,000 feet, with about sixty percent of the area being over 7,000 feet in elevation.

The MWSA instructed that the Forest Service "maintain presently existing wilderness character." MWSA, 91 Stat. 1243 (1977) at § 3(a). Upon adoption of the Final Rule, all motorized or mechanized transport, including bicycles, for both summer and winter uses, is prohibited in the entire Blue Joint and Sapphire WSAs.

## III. Vehicle Type Designations

The Travel Plan restricts snowmobile access on 205,141 acres for winter use. Further, after receiving public comment on the DEIS, the Travel Plan prohibits bicycling throughout the two WSAs. Of particular interest to the Plaintiffs is the closure of backcountry bicycling on an additional miles of trails in the WSAs.

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether [an] agency could reasonably have found the facts as it did" based upon the "evidence in the administrative record." *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (citations omitted).

Claims brought pursuant to NEPA, the Wilderness Act, and MWSA are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. *See, e.g., Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012), *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, a "reviewing court shall hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision.*" Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (quotations and citations omitted). The Court's scope of review is

-6-

narrow, and the Court should "not substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Nonetheless, an agency must still examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *MotorVehicle*, 463 U.S. at 43 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In reviewing that explanation, a court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations omitted); *see also Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). The "court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

## ANALYSIS

### I. RWAs

#### a. Predetermination

At the outset, Plaintiffs assert that the RWA management decisions were improperly influenced by Region 1 guidance as opposed to the site-specific

analysis of impacts to wilderness character in the Bitterroot Forest. (Doc. 39 at 14–18.) Plaintiffs contend that the regional guidance created an inflexible prohibition of all motorized and mechanized travel in the RWAs that was prejudged and dictated. Plaintiffs claim that the record here differs significantly from the record in *Ten Lakes Snowmobile Club v. U.S. Forest Service*, CV 15–148–M–DLC, Doc. 64 (Oct. 18, 2018) (hereafter "*Ten Lakes*"), where the Court found that the Plaintiffs focus on Region 1 guidance was unfounded and purely speculative. (Doc. 39 at 14.) Federal Defendants and Defendant-Intervenors respond that the record fails to demonstrate predetermination. (Docs. 46 at 28; 49 at 29.)

NEPA has a twofold goal: to "ensure the agency will have detailed information on significant environmental impacts when it makes its decisions" and to "guarantee that this information will be available to [the public]." *Inland Empire Pub. Lands Council v. U.S. Forest Service*, 88 F.3d 754, 758 (9th Cir. 1996). NEPA "does not mandate particular results, but simply describes the necessary process that an agency must follow in issuing an [environmental impact statement]." *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quotation omitted). In reviewing agency action under NEPA, a district court may not substitute its judgment for that of the agency. *Id.* "NEPA

-8-

does not require that agency officials be 'subjectively impartial.'" *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). However, it does require Courts to take a "hard look" at the agency decision and ensure that the decision was "taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Id.*

Predetermination is a high standard to prove. *Metcalf* is the leading case in the Ninth Circuit on this issue and explains that predetermination only occurs when an agency has made "an irreversible and irretrievable commitment of resources" based upon a particular environmental outcome, prior to completing its requisite environmental analysis. *Metcalf*, 214 F.3d at 1143. In *Metcalf*, the Ninth Circuit held agencies predetermined the NEPA analysis when they signed two agreements binding them to support a proposal before the completion of an environmental assessment and a finding of no significant impact. *Id.* at 1144.

Alternatively, Plaintiffs assert that the Tenth Circuit provides further guidance on predetermination when there is not a subjective element like a contractual obligation involved. In *Forest Guardians v. U.S. Fish & Wildlife Serv.*, the Tenth Circuit found that "predetermination occurs only when an agency irreversibly and irretrievably commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the

-9-

agency has completed that environmental analysis-which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." 611 F.3d 692, 714 (10th Cir. 2010) (citations omitted).[3] Plaintiffs also rely on *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002), where the Tenth Circuit found that federal decisionmakers cannot make a "rush to judgment" based off a predetermined direction.

After reviewing the record in this case, the Court finds that there is no indication that the Forest Service made such an irreversible and irretrievable commitment to close the Bitterroot RWAs. The Court acknowledges that the record here does have more evidence that the regional guidance existed and that forest service personnel understood this guidance and attempted to be consistent with it when revising the forest plan. *See* AR 43785, 43733, 43496, 43655, 43644–45. However, the Court does not agree with Plaintiffs that "key personnel undertook a mission to change RWA management, in which they unabashedly advocated for an outcome." (Doc. 39 at 16.)

---

[3] The Court notes that the Tenth Circuit in *Forest Gaurdians* explained its intent was to align with the standard outlined by the Ninth Circuit in *Metcalf.* 611 F.3d at 714–15. The Tenth Circuit found that "predetermination is different in kind from mere 'subjective impartiality'" and that to establish predetermination a Court must find "that the agency has irreversibly and irretrievably committed itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis." *Id.* Therefore, the Court does not find a difference between Tenth Circuit and Ninth Circuit law on the issue of predetermination.

An agency can have a preferred alternative in mind when it conducts a

NEPA analysis. 40 C.F.R. § 1502.14(e); *see also Ass'n of Pub. Agency Customers,*

*Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1185 (9th Cir. 1997) (noting that

"an agency can formulate a proposal or even identify a preferred course of action

before completing an EIS"). While Plaintiffs demonstrate in Exhibit A[4] that the

language found in the text of the guidance is found verbatim in the DEIS, the Court

does not find that this is indicative of a predetermined commitment to close the

Bitterroot RWAs. *See* AR 43781 and 43496 compared with AR 02992–93, 00565,

02825. These paragraphs simply repeat the overall direction of the Forest Service

in managing RWAs. The Court fails to identify how a few paragraphs of

generalized framework for RWA management and sentences cited in emails from

Forest Service personnel prove that predetermination occurred. The record is

replete with evidence that the Forest Service conducted a thorough NEPA analysis

involving multiple public comment periods and the consideration of alternatives

such as a limited quota permit system in RWAs. AR 00187–90, 00209. Thus,

while Region 1 guidance is consistent with the final Bitterroot Travel Plan, the

Forest Service took a "hard look" at the environmental impacts of alternative

---

[4] Exhibit A contains an email from Chris Ryan (Doc. 39 at 41), a selective portion from
the DEIS (*Id.* at 42–45), excerpts from the July 2015 Objection Response (*Id.* at 46–47), and a
single page from the Final ROD (*Id.* at 48).

-11-

motorized and mechanical transport use and determined that closure of the RWAs in the Bitterroot was most appropriate to maintain forest integrity.

Consequently, the Court grants Federal Defendants' and Defendant-Intervenors' motions for summary judgment and denies Plaintiffs' motion for summary judgment on this predetermination claim.[5]

### b.    Absence of Data or Analysis

Next, Plaintiffs contend that the record is insufficient and that there is no data whatsoever that reflects an appropriate forest level analysis required under NEPA to determine the designation of RWAs in the Bitterroot Forest. They argue that a scientific analysis of impacts on RWAs is possible and routinely conducted by the Forest Service, but that the Forest Service based its rationale only on "social" impacts which is not a rational basis for complete closure of the RWAs to motorized and bicycle use. (Doc. 39 at 20–21.) Federal Defendants counter that the Forest Service conducted a rigorous review of the available data and made its determination to close RWAs to motorized and bicycle use through an informed

---

[5] Plaintiffs also contend that the Travel Plan designation of RWAs advances impermissible goals. (Doc. 39 at 21–22.) The Court finds this argument inextricably intertwined with the predetermination argument and issues the same ruling as to this claim. The Forest Service did not run afoul of the APA and NEPA standard when it utilized the Region 1 guidance alongside a thorough environmental impact analysis of the Bitterroot Forest in determining whether RWAs should be closed to all motorized and mechanized use. Consequently, the Court grants Federal Defendants' and Defendant-Intervenors' motions for summary judgment and denies Plaintiffs' motion for summary judgment on this claim.

decision. (Doc. 47 at 18.) Defendant Intervenors concur with Federal Defendants that the Forest Service took a "hard look" at the environmental consequences of its decision to close RWAs to such traffic. (Doc. 51 at 16.)

"The [MWSA] requires the Service to administer wilderness study areas 'so as to maintain their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System.'" *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1042 (9th Cir. 2011) (citing Montana Wilderness Study Act § 3(a)). There are two requirements under the MWSA: "[f]irst, the Service must administer study areas so as to maintain their wilderness character as it existed in 1977;" and "[s]econd, the Service must administer the areas so as to maintain their potential for designation as wilderness areas—i.e., as part of the National Wilderness Preservation System." *Id.*

Further, NEPA's "required 'hard look' at environmental consequences . . . does not require adherence to a particular analytic protocol." *Asssociation of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997). "The specific methodology appropriate in a given circumstance will depend on the variable factors peculiar to that case, and we must judge it under a rule of reason." *Id.* "[An] agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the

-13-

facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted). A court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (citing *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974)). However, a mere "bare assertion of opinion coming from an [agency] expert . . . without any supporting reasoning, would not pass muster in an EIS." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1103 (9th Cir. 2016) (citations omitted).

Here, the Court finds that the Forest Service supported its conclusion to close RWAs in the Bitterroot to motorized and bicycle use with sufficient, reliable scientific factors. The Forest Service found that motorized and mechanized use sharply increased over the past 40 years and that prohibiting such uses would "protect the existing high value of the areas for providing primitive recreation experiences, and ensure the area retains its wilderness qualities." AR 00564–65; 00566, 00209–11. The Forest Service further recognized that there are direct and indirect consequences of allowing such uses to occur, and noted in the FEIS that while "some types of motorized and mechanical transport use do not appear to have lasting effects on the landscape, there may be impacts on the social and biotic environment that do not show as physical "scars" on the land." AR 00565.

Specifically, the FEIS discusses the direct and indirect environmental effects of various alternative measures to RWA management. AR 00565–70. The Forest Service assessed four alternatives for RWA management in relation to summer motorized/mechanical transport and winter motorized/mechanical transport. There are no open miles of trails in RWAs in the summer or winter in Alternative 1 and 4. Alternatives 2 and 3 provide 39.7 miles of motorized trails and 67.8 miles of mechanical trails, and 63.6 miles of motorized trails and 67.8 miles of mechanical transport, respectively, in the summer, and 73,809 acres and 74,097 acres, respectively, in the winter. AR 00565. The FEIS goes on to explain the differences between the four alternatives and concludes that allowing motorized or mechanical transport would "adversely affect the naturalness of an area and the feeling of being underdeveloped." AR 00567. In response to public comment to the DEIS, the Forest Service revised Alternative 3 to reflect increased trail use to motorized users. However, again, the FEIS determines that Alternative 2 and 3 are not appropriate because of the effects on the primitive character of the RWA areas and the noise associated with motorized use which can affect the experience of solitude.

The Court does not find that the Forest Service was arbitrary and capricious because it did the appropriate research and analyzed alternative approaches. In

fact, the Forest Service acknowledged that it had minimal data available to it regarding the state of the Bitterroot Forest in 1977, but used available information to discern the present date impact on RWAs due to motorized and mechanized uses.

The Court notes that the Plaintiffs are making a blanket statement here that the Forest Service did not make any site-specific analysis as to RWAs in the Bitterroot. The Plaintiffs have not identified what additional steps the Forest Service should have taken to comply with NEPA. As explained above, the Court concludes that the record proves the Forest Service took a "hard look" at long-term environmental harm in the Bitterroot, assessed the impact of motorized and bicycle use at a site-specific level to the best of its ability, and designated RWAs properly.

Therefore, the Court grants Federal Defendants' and Defendant-Intervenors' motions for summary judgment and denies Plaintiffs' motion for summary judgment on this claim related to designation of RWAs under NEPA.

**II.    WSAs**

Plaintiffs next contend that the Travel Plan illegally imposed wilderness management standards on the Sapphire and Blue Joint WSAs. Plaintiffs arguments are twofold: (1) that the Forest Service improperly interpreted the governing MWSA law; and (2) that there was no site-specific analysis to justify WSA

closures and that the closures advanced impermissible goals. (Doc. 39 at 22–26.) Federal Defendants and Defendant Intervenors disagree. (Docs. 47 at 13–19; 51 at 8–15.)

The same legal principles in *Russell Country* and NEPA standards examined in Section I above apply here.

First, the Court concludes that the Forest Service properly interpreted the MWSA guidelines for maintaining existing wilderness character in 1977. Because the Forest Service found that the current amount of motorized and mechanical users has far surpassed the 1977 levels, it appropriately created current wilderness designations beyond what existed in 1977. The Ninth Circuit found in *Russell Country* that nothing in the MWSA prohibits the Forest Service from enhancing the wilderness character of a wilderness study area. 668 F.3d at 1044.

Second, the Court finds that the Forest Service did not err in changing the management of the Sapphire and Blue Joint WSAs to restrict motorized and mechanical use in order to maintain the areas' 1977 wilderness character. AR 00209. The Forest Service analyzed available data to estimate the number of motorized and mechanical users from 1977 to 2009 in the Study Areas, as indicated through the Northern Region economist, Keith D. Stockman's report (AR 40921–40940). The analysis conducted in the Blue Joint area found that

-17-

snowmobile use grew more than four-fold, off-highway-vehicle use grew nine-fold, and bicycle use went from non-existent to common use. *Id.* The FEIS identified early evaluations of the areas, wilderness characteristics, and the direct and indirect environmental effects of each alternative. AR 00571, 00577, 00583–95.

The Ninth Circuit found in *Montana Wilderness Ass'n v. McAllister*, "the Service must ensure that the study area's overall 1977 wilderness character is not degraded, there is no requirement that it replicate 1977 conditions precisely. We recognize that the Service's attempt to maintain 1977 wilderness character, including 1977 opportunities for solitude, may necessarily be approximate and qualitative." 666 F.3d 549, 559 (9th Cir.), aff'd, 460 F. App'x 667 (9th Cir. 2011). The Court finds here, that while the Forest Service did not have complete data relating to the recreational use of the Bitterroot Forest over time, it did the best it could with the data it had and did not ignore the possibility of allowing motorized and mechanical recreational use in WSAs. Thus, the Forest Service adequately grappled with the problem defined by the MWSA and appropriately limited use in WSAs to maintain wilderness character.

Third, the Court finds that the Forest Service did not advance impermissible goals by closing WSAs. Plaintiffs contend that the Forest Service decision to

-18-

manage WSAs for "social and ecological characteristics" runs afoul of

Congressional intent. Because the Forest Service has broad authority to manage

and protect wilderness character, the Court gives deference to the Forest Service as

to what factors—social, ecological, or otherwise—have the largest impact on its

decision to close WSAs to all uses other than hiking and horseback.

Consequently, the Court grants Defendants' and Defendant-Intervenors'

Motion for Summary Judgment and denies Plaintiffs' Motion for Summary

Judgment on the WSA claim.

## III.    **Forest Plan Consistency**

Next, Plaintiffs argue that the Travel Plan Closures are not consistent with

the Forest Plan in violation of NFMA. Plaintiffs claim is twofold: (1) that the

Travel Plan does not comply with Standard Three for Recommended Wilderness

(Management Area Six), which directs the Service to "[c]ontinue uses which do

not detract from wilderness values" such as "trailbikes and snowmobiles." (Doc.

39 at 21) (citing AR 04749); and (2) that the Travel Plan is inconsistent with the

Forest-wide management objective to "[p]rovide for the current mix of dispersed

recreation by maintaining about 50 percent of the Forest in wilderness, about 20

percent in semi primitive motorized recreation and about 30 percent in roaded

areas." (*Id.* (citing AR 04679).) Federal Defendants counter that Plaintiffs ignore

-19-

the Forest Service's determination that motorized and mechanized use would degrade wilderness character (AR 00210), and that "the Travel Plan does not change land use allocations; it maintains the recreation opportunities as allocated in the Forest Plan." (Doc. 47 at 24–25.)

A Travel Plan must be consistent with the Forest Plan. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005) (citations omitted). A Forest Plan operates as somewhat of a zoning ordinance, "defining broadly the uses allowed in various forest regions, setting goals and limits on various uses (from logging to road construction), but does not directly compel specific actions, such as cutting of trees in a particular area or construction of a specific road." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003). However, "[a]t the lowest tier of forest rules are the so-called "site-specific" plans, which are prepared to effect specific, on-the-ground actions; these plans must be consistent with both sets of higher-level rules." *Id.* (citing 16 U.S.C. § 1604(i)). A court should defer "to the Forest Service's interpretation of plan directives that are susceptible to more than one meaning unless the interpretation is plainly erroneous or inconsistent with the directive." *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 555 (9th Cir. 2009).

-20-

Here, the agency's position is not contrary to the language of the Forest

Plan. First, the Court notes that Plaintiffs rely on no legal authority to support their

argument other than the language of the Forest Plan and standard 3(a)(3).

Moreover, the Court does not agree that the Forest Plan "commands" continued

current uses regardless of their impact on wilderness character. Instead, the Forest

Service appropriately analyzed the current uses and determined that they would

detract from wilderness character, as indicated by the Forest Plan directive. *See*

AR 00901 (finding that maintaining current motorizes and mechanical use would

have seasonal and short term effect on animal movement, migration, and

dispersal); AR 00512–13 (finding that users often complain about motorized use);

AR 00563–617 (discerning the various impacts to wilderness characteristics of

RWAs and WSAs.

For these reasons, the Court grants Defendants' and Defendant-Intervenors'

Motion for Summary Judgment and denies Plaintiffs' Motion for Summary

Judgment on this claim.

## IV.  Nonmotorized Zoning

Next, Plaintiffs contend that the Travel Plan improperly creates large

nonmotorized blocks which does not comply with the Travel Management Rule.

Plaintiffs argue that the Travel Plan here did not designate roads, trails, and areas

-21-

for motorized vehicle travel, but rather made it a priority to create "large blocks" of "quiet use" recreation. (Doc. 39 at 28) (citing AR 10513; 02889). Federal Defendants and Defendant Intervenors counter that they complied with the Travel Management Rule pursuant to 36 C.F.R. § 212.55(b)(3). (Docs. 47 at 33–36; 51 at 25–29)

In 2005, the Forest Service published the Travel Management Rule, 36 C.F.R. §§ 212.1–261.55, which mandates certain changes to the management of motor vehicle use on National Forest System lands. Subpart B of the Travel Management Rule requires each administrative unit or ranger district of the Forest Service to designate a system of roads, trails, and areas open to motor vehicle use by vehicle type and time of year. 36 C.F.R. §§ 212.50–212.57. Section 212.55(a) sets forth the criteria for designating roads, trails, and areas, stating that the responsible official shall consider: "natural and cultural resources, public safety, provision of recreational opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the availability of resources for that maintenance and administration." 36 C.F.R. § 212.55(a). In addition, the Forest Service must consider, with the objective of minimizing, effects on "[c]onflicts between motor

vehicle use and existing or proposed recreational uses," and the "[c]ompatibility of motor vehicle use with existing conditions in populated areas, taking into account sound, emissions, and other factors." *Id.* at § 212.55(b)(3), (5); *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015)[6]

Plaintiffs make three arguments relating to this claim: (1) the Forest Service did not examine the conflicts of "use," but only the conflicts between "users;" (2) the Forest Service improperly fixated on subjective user preferences and personal values in reaching its decision about which areas to designate for quiet-use recreation, rather than objective motor vehicle use; and (3) the designation of non-motorized areas is "entirely bereft of data or fact." (Doc. 39 at 24–26.)

Having reviewed the DEIS, FEIS, and ROD, the Court finds the Defendants satisfied NEPA's "hard look" requirement in their consideration and discussion of the impact the Travel Plan may have upon the particular uses and relied on all available data it had before it to render its decision. The Forest Service considered the three rounds of National Visitor Use Monitoring Surveys ("NVUM") that

---

[6] The Court agrees with Federal Defendants that the NEPA cases cited by Plaintiff in support of this Travel Management Plan claim are unpersuasive and are not controlling on how the Forest Service should interpret Subpart B of the Travel Management Rule. (See Doc. 39 at 29) (citing *Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017) (discussing whether an agency action is "likely to be highly controversial" under 40 C.F.R. § 1508.27(b)(4) of NEPA) and *Simmons v. Army Corps of Eng'rs*, 120 F.3d 664, 669–670 (7th Cir. 1997) (holding that an agency need not "examine every conceivable alternative" but rather that NEPA requires focusing "only on the potentially feasible" alternatives)).

occurred in the Bitterroot in October 2001 through September 2002, October 2006 through September 2007, and October 2011 through September 2012. AR 00487. The FEIS illustrates the NVUM survey results in a table for Round 1 and 2 by use. AR 00488-00489. Thus, the Forest Service considered the conflicts between motor vehicle use and other non-motor recreational uses. Further, the ROD clarified that the change in terminology from "users" to "uses" from the DEIS was due to a misinterpretation among some members of the public. AR 00394. Therefore, Plaintiffs first argument is without merit.

Plaintiffs' second argument also fails because the entire reasoning behind the Travel Management Rule was to revisit the management of motor vehicle use on National Forest System lands. The best way to measure "conflicts" between motor and nonmotorized use is to evaluate the public's preferences and personal values when recreating in the Bitterroot.

Finally, Plaintiffs third argument that the Record has no data or fact to support the designation of nonmotorized areas is contradicted by the analysis contained in the FEIS and ROD. Plaintiffs again contend that there was no site-specific analysis conducted as to the "conflict" between uses in the Bitterroot. However, the FEIS notes the "conflicts of uses" through the NVUM surveys, and comments from public and state agencies regarding use conflict (for instance, the

Montana Fish, Wildlife & Parks' comment letter that discusses hunter complaints related to OHV use). AR 00512–14.

Therefore, the Court finds that the Forest Service's decision to designate areas for nonmotorized use complies with the Travel Management Rule. The Court grants Defendants' and Defendant-Intervenors' Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment on this claim.

## V.  Vehicle Type Restrictions

Finally, Plaintiffs argue that the Travel Plan arbitrarily designates vehicle type restrictions, focusing on snowmobiles and bicycles. The Court addresses each vehicle type below.

### a.  Snowmobiles

Plaintiffs assert that the Forest Service impermissibly made snowmobile designations by focusing on areas rather than individual routes, and that the Record must reflect at least rational determinations based on an articulable analysis. (Doc. 39 at 31.) In sum, Plaintiffs disagree with the closure of 205,141 acres of snowmobile use in the Bitterroot. (*Id.*) Federal Defendants and Defendant Intervenors counter that the Forest Service provided a reasoned explanation for over-snow vehicle designations in compliance with NEPA. (Docs. 47 at 26–27; 51 a 28–29.)

Subpart C of the Travel Management Rule requires the Service to designate roads, trails, and areas for over-snow vehicle use. 36 C.F.R. § 212.81(a). The designation criteria for Subpart B, including minimization, apply to over-snow vehicle use. *Id.* § 212.81(d).

Plaintiffs' argument is unpersuasive. Plaintiffs have not cited to any supporting authority other than *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, which merely discusses the arbitrary and capricious standard under NEPA. Plaintiffs essentially rehash here the same arguments made in relation to the RWAs and WSAs discussed in sections I and II above. There is ample analysis and data in the Record to support the Forest Service's decision to close certain parts of the Bitterroot to over-snow vehicle use. Overall, the ROD reduces the designated areas for snowmobile use from 748,981 acres to 543,840 acres on the 1.6 million acre Bitterroot Forest. AR 00193, AR 00196 (Table 3). A majority of this acreage is due to closure of RWAs and WSAs, as discussed above. The remaining approximate 60,000 acres are closed to over-snow vehicles to protect ecological processes, wildlife, soil and water resources, and provide a more primitive recreation experience. AR 00203–05. Section 212.81(a) allows the agency to designate "areas" for over-snow vehicle use on National Forest System lands.

Thus, the Court grants Federal Defendants' and Defendant-Intervenors' motions for summary judgment and denies Plaintiffs' motion for summary judgment on this claim.

**b. Bicycles**

Finally, Plaintiffs argue that Federal Defendants have not properly designated bicycle use because they should be evaluated apart from motorized vehicles in the Travel Plan. (Doc. 39 at 32–35.) Specifically, Plaintiffs narrow their focus on the ROD's closure of 110 miles of trails in WSAs in addition to the approximate 68 miles of trails already closed in RWAs in the Draft EIS, reducing the total miles of trail available to bicycles in the Bitterroot forest from 1,222 to 1,112. AR 00196. Plaintiffs contend that (1) there is no rational discussion of impacts attributable to bicycles in the Record, and (2) this eleventh-hour change in the ROD is not a minor variation from the DEIS and that a Supplemental EIS was required by the Forest Service under NEPA. (Doc. 39 at 32–35.) Federal Defendants and Defendant Intervenors argue that the Forest Supervisor exercised its discretion to expand the analysis to include nonmotorized or mechanical transport uses, and that the prohibition of bicycles in WSAs did not constitute a substantial change sufficient to warrant a Supplemental EIS. (Doc. 47 at 28–33; 51 at 29–33.)

First, the Court acknowledges that the Record gives little discussion in the DEIS and FEIS as to the physical impact of bicycle use in the Sapphire and Blue Joint WSAs. AR 00502–09. However, the Court defers to the Forest Service's rationale that the social impacts, including the feeling of being in an undeveloped setting, are sufficient to support its decision to close RWAs and WSAs to bicycle transport. AR 00525, 00560–62 (explaining that wilderness character is "free from modern human manipulation and impacts"), 00512 (discussing the impacts of noise on the natural environment). Thus, given that bicycle use was not occurring in 1977 but has grown exponentially since then, AR 00209–11, it was not arbitrary and capricious for the Forest Service to prohibit bicycles in areas that may be suitable for designation as wilderness.

Further, the Court notes that the Forest Service did not skirt around public comments indicating that "the Bitterroot National Forest was 'lumping' mountain bike use in with motorized use, and failing to recognize the difference between the two types of uses." AR 00502. The Forest Service acknowledged those comments and responded appropriately. AR 00140–42.

The Court also finds that the increase in WSA closure to bicycles in the ROD does not require a supplemental NEPA analysis. NEPA requires that an agency supplement a draft EIS if the agency makes "substantial changes in the

-28-

proposed action that are relevant to environmental concerns[.]" 40 C.F.R.
1502.9(c)(1)(i). If the final agency action "departs substantially from the
alternatives described in the draft EIS," a supplemental EIS is required. Russell
Country Sportsmen v. U.S. Forest Serv., 668 F.3d 1037, 1045 (9th Cir. 2011)
(quoting 40 C.F.R. § 1502.9(c)). However, while Section 1502.9 does not define
the terms "substantial changes" and "relevant to environmental concerns," the
Council for Environmental Quality (CEQ) has published guidance on when
changes to a proposed action will require preparation of a supplemental EIS. *Id.*
"The CEQ guidance provides that supplementation is not required when two
requirements are satisfied: (1) the new alternative is a "minor variation of one of
the alternatives discussed in the draft EIS," and (2) the new alternative is
"qualitatively within the spectrum of alternatives that were discussed in the draft
[EIS]." *Id.* (quoting and adopting Forty Most Asked Questions Concerning
CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026,
18,035 (Mar. 23, 1981)).

Plaintiffs only argument is that unlike in *Ten Lakes* where the change
increased the management of river segments by only .01%, here the post-DEIS
closure of WSAs more than doubled the reduction of bicycling opportunity, adding
outright prohibitions in WSAs on top of the 67 miles previously disclosed in the

-29-

RWAs. (Doc. 39 at 34–35.) The ROD closed 110 miles of trails in WSAs from

bicycle use, which is 9% of the 1,222 miles available for mechanical transport on

the Bitterroot. See AR 00196, 00525, 00587, 00610. Nine percent of trail closure

is still a minor variation, and the Court finds this to be qualitatively within the

spectrum of alternatives that were discussed in the FEIS (Alternative 1 and 4

closed all RWAs, and limited mechanized use to 47.6 miles in WSAs). *See* AR

00610. Accordingly, no supplemental EIS was required.

Similar to the Court's finding in *Ten Lakes*, however, the issue here lies with

the issuance of the ROD without an objection response period in regards to total

closure of 110 miles of WSA trails to bicyclists. The FEIS explains that

Alternative 1 would allow 47.6 miles of mechanical transport use/mountain bike

travel. AR 00610. The DEIS did not mention the addition of 62.4 miles closed to

bicycle use in the WSAs.[7] Public comment was allowed after the DEIS was

_____

[7] The Court acknowledges that there is a discrepancy in the total miles closed in WSAs. Plaintiffs contend it is "roughly 98 miles of outright prohibitions on top of the 67 miles previously disclosed in the RWA." (Doc. 39 at 35.) This is likely taken from the declaration of Lance Pysher which indicated that "a total of 164.79 miles of routes in recommended wilderness and wilderness study areas combined that would be closed by the Travel Plan decision. About forty percent are in recommended wilderness (66.80 miles) and the remaining sixty percent are in wilderness study areas, but not recommended wilderness (97.99 miles)." (Doc. 41 at 5–6.) However, the ROD states that a total of 110 miles of trails are closed in WSAs. AR 00196. Thus, the Court is using the total amount of miles available to mechanical transport in the FEIS (47.6 miles), and subtracting that number from the total amount of miles closed in the ROD (110 miles). If the total is closer to 98 miles of trials closed in WSAs, then we are talking about a difference of approximately 50.4 miles (98 miles minus 47.6 miles). In any event, this confusion

-30-

issued, but the Forest Service did not provide any objection response period in regards to the FEIS or ROD. This was error. Consequently, the Court finds that the Forest Service abused its discretion by including the extra miles of WSA bicycle use closure without providing public comment. The Court remands this specific portion of the Final ROD to the Forest Service, and grants Plaintiffs motion for summary judgment on this claim.

## CONCLUSION

When an agency action is not promulgated in compliance with the APA, the action is deemed to be invalid. *Organized Village of Kake*, 795 F.3d at 970; *see also Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). Further, upon remand, a court should provide the agency with specific instructions to address its errors. *Friends of Wild Swan v. U.S. Envtl. Protec. Agency*, 74 Fed. Appx. 718, 722 (9th Cir. 2003) (unpublished) ("We have previously found remand with specific instructions to be an appropriate remedy for APA violations.").

Here, because the Court concludes that the Forest Service's decision to close additional miles of mechanized transport trails in WSAs without public comment

---

further demonstrates the issue here when the Forest Service closed additional miles of trails in WSAs from the FEIS to the ROD.

-31-

was arbitrary and capricious, the Court remands the Bitterroot Forest Plan with instructions to: (1) conduct an objection response period with respect to these additional miles of trails in the Sapphire and Blue Joint WSAs; (2) take the objections into consideration; and (3) either modify the FEIS and Final ROD accordingly, or show that the eligibility of the total 110 miles of mechanized use closures in WSAs is permissible under the APA. In all other respects, the Court finds that the Bitterroot Forest Plan does not violate the NEPA, NFMA, or MWSA. With the exception of the narrow remand ordered above, the Court finds that the Plaintiff has failed to establish that the challenged actions of the Forest Service were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

Accordingly, IT IS ORDERED that:

(1)     Plaintiff's Motion for Summary Judgment (Doc. 38) is GRANTED IN PART AND DENIED IN PART;

(2) Federal Defendant's Cross-Motion for Summary Judgment (Doc. 46) is GRANTED IN PART AND DENIED IN PART;

(3) Defendant-Intervenors' Cross-Motion for Summary Judgment (Doc. 50) is GRANTED IN PART AND DENIED IN PART;

(4) Federal Defendant's Motion to Strike Extra-Record Materials (Doc. 44)

is GRANTED.

(5) This matter is REMANDED to the United States Forest Service for

further consideration consistent with this order.

DATED this **29**<sup>th</sup> day of June, 2018.

Dana L. Christensen, Chief Judge
United States District Court